# FULTON *v.* UNITED STATES.

---

CRIMINAL LAW; JURY COMMISSION; OATH OF OFFICE; INDICTMENT; ELECTION; EMBEZZLEMENT; EVIDENCE; MISCONDUCT OF COUNSEL; WITNESSES; INSTRUCTIONS TO JURY; CHARGE TO JURY.

1. It is not necessary that the clerk of the supreme court of the District of Columbia, the United States marshal and the collector of taxes, each of whom is required to take an oath of office, and who collectively by sec. 198, D. C. Code (31 Stat. at L. 1222, chap. 854), are constituted a commission to from time to time make a list of jurors to serve in the supreme court of the District of Columbia, should take additional oaths of office as jury commissioners.

2. In a criminal case the prosecution is seldom, if ever, required to elect

Note.—On embezzlement as affected by belief in right to property taken, see note in 41 L.R.A. (N.S.) 556.

As to reversal of conviction because of unfair or irrelevant argument or statement of facts by prosecuting attorney, see note in 46 L.R.A. 641.

· upon which of several counts of the indictment charging the same offense, but in different ways, it will stand.

3. Where an indictment for embezzlement contains two counts, one charging the accused with the embezzlement of money as that of an individual named, and the other charging him with the embezzlement of the same money as that of the same individual and sixteen other persons named, it is error for the trial court to permit the jury to return a verdict of guilty upon both counts.

4. While in a criminal case a general judgment upon an indictment containing several counts on a verdict of guilty on each count will not be reversed on appeal if any count is good, this rule does not apply where the verdict is upon counts charging distinct and inconsistent offenses. (Following *Davis* v. *United States*, 37 App. D. C. 126.)

5. In a criminal prosecution in which the accused claims he wrote a certain letter to the prosecuting witness, which the latter denies ·having received, it is misconduct on the part of the prosecuting officer, calling for a reversal of a judgment of conviction, where such officer, in his address to the jury at the close of the evidence, states that the prosecution had objected to the receipt in evidence of what purported to be a carbon copy of the letter "because we believe and we know that it was a statement gotten up by the defendant," and where the prosecuting officer is not promptly rebuked by the court, and does not disclaim any personal knowledge of the facts, but, on objection by the defendant, repeats his statement, and the court in an ensuing colloquy accentuates it.

6. In a prosecution for embezzlement, it is error for the trial court to refuse to admit in evidence an alleged carbon copy of a letter claimed to have been sent by the accused to the prosecuting witness, where the latter testified that he had received no such letter, but the clerk of the accused testified that, although he could not remember mailing the letter, he remembered writing it, and that he had not deviated from his usual custom of submitting to the accused all letters written by him for his signature immediately after writing them, putting them in envelopes, stamping, and at once mailing them, and the contents of the alleged letter are material to the defense; and such error is not cured by the trial court permitting the prosecution to introduce the carbon copy in evidence during the cross-examination of the accused.

7. Where in a prosecution for embezzlement of money the defense is that the accused used the money after collecting it, in the belief that the prosecuting witness had consented to his doing so, it is error for the trial court to refuse an instruction asked by the accused, to the effect that if the jury believe that the accused appro-

priated the money to his own use, in the belief that the prosecuting witness had consented to his using the same, and that he did not at that time intend to wrongfully or fraudulently convert it, then such appropriation was not embezzlement as charged, and no subsequent act of his would change the character of the original appropriation; and the error of refusing such an instruction is not cured by the court's telling the jury in his charge that it was for them to say whether the accused received the money without such an agreement having actually been made with the prosecuting witness, and then converted it to his own use, especially where the court has already in effect ruled that the letter claimed to have been written by the accused to the prosecuting witness shortly before the accused received the money, and in which the accused said that he would use the money when it was collected unless the prosecuting witness wrote to the contrary, should not be considered by the jury unless they found that it was actually received by him. (Citing *Masters v. United States,* 42 App. D. C. 350.)

8. It is error for the trial court in a criminal prosecution to refuse an instruction asked by the accused, to the effect that any reasonable doubt resulting from any conflict or inconsistency in the testimony of any witnesses upon any material fact should be resolved in favor of the accused, and then in the charge to the jury to single out the accused as the only witness whose testimony deserved a close scrutiny, by telling the jury that the deep personal interest of the accused in the result of the case should be considered in weighing his evidence and in determining how far or to what extent it was worthy of credit.

9. In the prosecution of a lawyer for the alleged embezzlement of money collected for a client, where the defense is that the relation of debtor and creditor, and not that of attorney and client, existed, a promissory note given by the accused to the prosecuting witness is admissible in evidence when offered by the accused, if it bears upon the question of which relation existed.

10. A charge of the trial court in a prosecution for embezzlement upon the questions of burden of proof and presumption of innocence, *held* not to be erroneous.

No. 2889. Submitted March 17, 1916. Decided April 3, 1916.

HEARING on an appeal by the defendant from a judgment of conviction of the Supreme Court of the District of Columbia in a prosecution for embezzlement. *Reversed.*

The Court in the opinion stated the facts as follows:

This is an appeal from a judgment in the supreme court of the District, convicting defendant, Creed M. Fulton, of embezzlement, the sentence of the court being three years in the penitentiary.

The indictment was in four counts, the first and third charging embezzlement, the second and fourth, which were abandoned, larceny after trust. In the first count defendant was charged with the embezzlement of $659.24 of the money and property of the prosecuting witness, Frederick M. Smith, which had come into the possession and under the care of defendant as agent, attorney, clerk, and servant of Smith. The third count charged the embezzlement of the same sum of money of the property of said Smith and sixteen other persons named, all heirs at law and next of kin of one Hiram R. Smith, deceased.

By plea in abatement defendant raised the question whether the grand jury which found the indictment against him was a legally constituted body, the contention being that because the jury commission, composed of the clerk of the supreme court of the District, the United States marshal, and the collector of taxes for the District, did not take an oath of office *as such commissioners,* their acts were void.

Before discussing the evidence in detail it may be well to state, in a general way, the theory of the prosecution and that of the defense. On behalf of the government it was contended that the above sum of money came into defendant's hands as attorney, and that he wrongfully converted it to his own use; in other words, that he embezzled it. Defendant freely admitted that he received the money and that he appropriated it to his own use, but contended that the appropriation was under an agreement or understanding with the prosecuting witness, whose authority in the premises was unquestioned, and hence that there was no conversion, wrongful or otherwise.

We come now to the facts material here. There was pending in the supreme court of the District an equity cause, in which interests of the heirs of the said Hiram R. Smith, deceased,

were involved.   These heirs lived in the West, and one of them, the complaining witness, who resided at Donnelly, Minnesota, acted for all.   Smith, called by the government, testified that on July 12, 1913, he came to Washington and engaged Clayton E. Emig, Esquire, and defendant to represent the heirs of the Hiram R. Smith estate in said equity cause.   The witness identified certain letters which defendant had written him concerning the settlement of the case, including one dated November 18, 1913, containing a statement of moneys received by defendant, and the expression of an intent to remit upon receipt of releases from said heirs.   The witness further testified that he received no remittance, and that finally, about June 14th or 15th, 1914, he came to Washington concerning the matter, and saw defendant, who said he would be able to pay within a day or two.   Witness was in Washington two weeks, and saw defendant half a dozen times during that period.   On July 1st, the day witness left the city, defendant gave him $90 in cash and two checks for the balance, which upon presentation at the bank in Donnelly were returned protested.   Thereupon witness turned the matter over to the county attorney at Morris, Minnesota.

On cross-examination the witness said that, when he employed defendant, witness explained to him that he represented his brothers and sisters and all of the grandchildren of Hiram R. Smith; that upon that occasion he was in Washington about four days, during which time "he became very familiar and close to Mr. Fulton; that he and Mr. Fulton became very friendly; that he was in Mr. Fulton's office every day; that on Sunday he was in Mr. Fulton's office practically all day;" that when the matter had been settled defendant wrote witness about the settlement; that defendant had never denied owing witness the money.   Witness admitted signing a letter dated December 7, 1914, and addressed to the district attorney for the District of Columbia, and reading as follows:

Dear Sir:
There is one or two matters that I fear I did not make clear

in the matter concerning Mr. Fulton's settlement with me which I wish to make clear to you.

The first is the $100, I sent Mr. Fulton for cost of appeal is fully accounted for by him in the statement of our settlement and there is no irregularity whatever about that.

The second is I agreed and permitted Mr. Fulton to keep and use the money as a temporary loan. And I feel this should be made clear before you go any further in the matter; hence I address you this note. While I was here last summer Mr. Fulton went all over the matter with me and in anticipation of paying the loan he gave me checks he expecting at that time to be able to take care of them, paying to me part of the money. As I was not given a chance to fully explain this when I was talking to your Mr. Given, this morning, I feel that I should write these facts otherwise a great injustice might be done Mr. Fulton as well as an irreparable injury. If necessary, I would be glad to have you lay this matter before the grand jury in order that they may understand how the matter is.

I may add that Mr. Fulton has made settlement with me and there is nothing more to the transaction. I called to see Mr. Fulton this afternoon late and found him ready to settle and in fact in the act of sending remittance of the balance due on the temporary loan.

According to the statement of the witness he went before the grand jury on Monday, December 5, 1914, and thereafter on the same day, and of his own volition, went to see defendant at his office. He went again on the morning of the 7th in response to a telephone call from defendant, who prepared the above letter and a duplicate original, and requested witness to sign both and hand the original to the district attorney. Witness then testified that he told defendant he would sign the original and hand it to Mr. Laskey, (the district attorney); that he did not do so, but, on the contrary, destroyed it. Later in his testimony he denied that he had told defendant that he would see the district attorney and hand him the original of said letter, or that he would mail it to him. He admitted that he subse-

quently saw both the district attorney and an assistant, but denied telling either of them about the letter. He did admit telling defendant about this interview with the district attorney and his assistant, and admitted telling defendant that the district attorney had said "that it (the Case) had gone before the grand jury, and he could make no change in it."

At another point in his testimony this witness denied telling defendant, subsequently to signing the letter, that he had been to see the district attorney. Witness further denied that he had a demand note for the balance due. Whereupon the court, of its own motion, struck out the evidence regarding the note. Defendant's counsel excepted, stating that "the object of this inquiry in reference to the note was to show that defendant gave to the witness said note covering the amount referred to as evidencing the debt." It further appeared that such a note was given the witness on the day he appeared before the grand jury, Smith testifying that some time later he mailed it to defendant with the statement "that the only thing he (witness's attorney) will consider is money in this matter, so I ask you to forward the money to Mr. Cherry as soon as possible." In another letter bearing the same date, namely, December 11, 1914, Smith according to his testimony wrote defendant that on his way home he had stopped off at Morris, Minnesota, and had a talk with his attorney, "about that we talked over in the office the day I left, and he told me he didn't think it would be good policy to take the steps you outlined in that letter." The letter continues: "I am very sorry I cannot help you out in that way, as you know it would put me in bad with the district attorney, and I am liable to get into trouble myself. Mr. Cherry told me to tell you that if you would send him the money to cover everything concerned in this matter, he would then take the matter up with the district attorney, Mr. Laskey, and do all in his power to help you out."

The witness further stated, on cross-examination, that as near as he could remember he had turned over to the district attorney all letters written him by defendant, "but he would not be cer-

tain; that there might be a letter or two somewhere that he did not get together; that he brought all the correspondence he could find; that he did not know whether he had lost any of the correspondence or not, as he never marked it down or kept any record of it." Thereupon witness was shown a carbon copy of a letter addressed to him at Donnelly, Minnesota, dated November 4, 1913, purporting to have been written by the defendant, and the witness "stated that he had not received a letter of that kind." Witness further denied that he had ever given defendant permission to use the money, or that defendant had ever asked for that privilege.

Defendant testified that upon Smith's first visit to Washington, when he employed defendant, he asked Smith "if, in the event he was successful in getting hold of the fund, he would be willing to permit witness to use the same for a short time, as he (witness) needed money by reason of the fact that he had lost considerable money," etc.; that "in response to such a request, Smith agreed to let witness have the use of said money for a short time if he was successful in recovering it." He further testified that on November 4, 1913, he dictated a letter to his then clerk and stenographer, a Mr. Bennett, a carbon copy of which letter witness identified; that the letter, in accordance with the usual custom, was written out, signed by the witness, and turned over to the clerk for mailing. It was to this letter that the complaining witness referred when he stated "that he had not received a letter of that kind." Upon objection being interposed to the receipt of the carbon copy of the letter in evidence, Mr. Bennett was called, and testified that he now is a law student in Georgetown University, but that he was in the employ of defendant from May of 1913 to the middle of January, 1914. Upon being shown said carbon copy he testified that defendant dictated the letter to him, and that he took it down in shorthand; that he then wrote out the letter, which defendant signed, and that witness mailed the letter to Frederick M. Smith; that the address of the original was shown in the carbon copy. Witness stated positively, on cross-examination, "that he remembered writing the letter and remembered its contents."

He admitted that he had no recollection of mailing that particular letter, "other than that Mr. Fulton signed all letters upon their being written, and witness immediately stamped, put them in envelopes, and sent them off." On redirect examination witness stated that there were a number of peculiar features about this particular case that tended to make a person remember it; that all letters were mailed by him; that immediately upon their being signed and stamped "he took them right out to the chute and mailed them on the sixth floor of the Colorado Building; the chute was around by the elevator shaft; that he always mailed the letters, and none of them ever stayed around there even for a short time; that the original letter had the letter heading of Mr. Fulton thereon, his office address, and so had the envelope; that the letter never came back to the knowledge of the witness," whose duty it was to open and glance over the mail in the morning. Over the objection and exception of the defendant, the copy of the letter was excluded. It reads as follows:

Mr. Frederick M. Smith,
              Donnelly, Minn.
Dear Sir:

As everything between Mr. Wheatley and myself will be closed within the next few days, I am writing to say that if you have not changed your mind about letting me have the use of the money for a short time, as we talked when you were here, I shall be glad to use it, say for not over sixty days. Unless you write to the contrary, by the 16th instant, I will take it that you are still willing for me to use the money for a while, which I will do, and again assure you of my very great appreciation of your kindness in this matter, for it will be of great relief to me at this time, as I am needing a little help financially to meet some pressing obligations.

As soon as the matter is closed, I will prepare statement of account and forward to you so you see just how the whole matter stands.

Again thanking you for your very great kindness in this particular, I am,

Very respectfully,

———— ————.

Defendant was then recalled to the stand, and gave his version of how the letter of December 7, 1914, to the district attorney came to be written. He stated that Smith came to his office voluntarily, defendant not even knowing that he was in the city; that Smith repeated the substance of what he had stated to the district attorney and to the grand jury, whereupon defendant asked him whether he had explained that "it was a loan." Upon receiving a negative reply, he asked Smith why he had omitted this explanation; that Smith replied that he had not been asked the question. Whereupon defendant asked him why, knowing the circumstances, he did not voluntarily make the statement, to which Smith replied that he did not think of it; that defendant then asked him if he would write the district attorney the facts, whereupon Smith answered that he would be glad to do so; that the letter was then written by defendant; that Smith signed the original as well as the copy; that notwithstanding that Smith at this time said he was about to leave town, he appeared at defendant's office the next morning and again in the evening; that during the interview of the morning the note was given Smith, and that it had never been returned. Neither had defendant received either of the letters of December 11th. During the interview of the afternoon Smith stated that he had explained the matter contained in the letter of December 7th to an assistant district attorney, and asked him to drop the prosecution; that the assistant expressed a willingness to do so, when the district attorney came along and stated that it had gone so far that he couldn't drop it. Defendant was asked whether he had any intent fraudulently to convert this money to his own use, and replied: "None whatever. As I stated at that time, I believed I had the right to use it by reason of my understanding with Mr. Smith."

During the cross-examination of defendant the witness again

was shown the carbon copy of said letter of November 4th, and, notwithstanding that it had been excluded when offered as evidence for defendant, it was introduced in evidence by the government.

Thereupon Mr. Bennett was recalled to the stand by the defense, and testified that he remembered the conversation between Smith and defendant in reference to the loan in July, 1913; that Smith mentioned the fact that some of the money was to go to minors, who could not get it until they became of age; that witness understood defendant was to pay interest if he used the money; that witness's attention was never called to this conversation; that he mentioned it to defendant when defendant asked him about this matter some six weeks previously; "that he then mentioned to Mr. Fulton the fact that he had overheard the conversation between Mr. Smith and him, and that during the conversation he had overheard that part of it."

*Mr. Levi H. David* and *Mr. Wilton J. Lambert,* for the appellant, in their brief cited:

*Allen* v. *United States,* 115 Fed. 3; *Anderson* v. *How,* 116 N. Y. 336, 22 N. E. 695; *Averitt* v. *State,* 76 Md. 510; 2 Bishop, New Am. Proc. p. 885; 1 Bishop, New Crim. Proc. 2d ed., Sec. 454; *Brown* v. *Paterson,* 25 App. D. C. 359; *Block* v. *State,* 44 Tex. 62; *Burke* v. *Maxwell,* 81 Pa. 139; *Cap. Trac. Co.* v. *Vawter,* 37 App. D. C. 29; *Carman* v. *Ross,* 64 Cal. 249; *Clare* v. *State,* 30 Md. 163; *Cochran* v. *United States,* 286; *Coffin* v. *United States,* 156 U. S. 432, 458; *Coffin* v. *United States,* 157 U. S. 2816; *Com.* v. *Byrne,* 1 Kulp, 378; *Com.* v. *Clemmer,* 190 Pa. 202; *Com.* v. *Derchuck,* 1 Kulp, 377; *Com.* v. *Haskins,* 128 Mass. 60; *Com.* v. *Lowrey,* 158 Mass. 18; *Com.* v. *Rush,* 11 Lam. Law. Rev. (Pa.) 164; *Com.* v. *Trimmer,* 1 Mass. 475; *Com.* v. *Webster,* 5 Cush. 295; *District of Columbia* v. *Donaldson,* 38 App. D. C. 259; *District of Columbia* v. *Gray,* 1 App. D. C. 500; *Ehrhart* v. *Rork,* 114 Ill. App. 509; *Fields* v. *United States,* 27 App. D. C. 449; *Gazley*

v. *State,* 17 Tex. Civ. App. 267; *Hamilton* v. *State,* 60 Ind.
193; *Harris* v. *State* (Fla.) 43 So. 311; *Henderson* v. *State,*
1 Tex. App. 432; *Hicks* v. *United States,* 150 U. S. 442, 452;
*Masters* v. *United States,* 42 App. D. C. 350; *McDowell* v.
*State,* 68 Miss. 348; *Milano* v. *United States,* 40 App. D. C.
380; *Mullen* v. *United States,* 106 Fed. 892; *Nalley* v. *State,*
28 Tex. App. 387; *People* v. *Ah Len,* 27 Am. St. Rep. 103;
*People* v. *Carr,* 64 Mich. 702; *People* v. *Dane,* 59 Mich. 550;
*People* v. *Derbert,* 138 Cal. 467; *People* v. *Fitspatrick,* 30
Hun, 493; *People* v. *Lee Chuck,* 78 Cal. 317; *Rodriquez* v.
*United States,* 198 U. S. 156; *Reg.* v. *Norman,* Car. & M. 501;
*Ruppert* v. *Wolfe,* 4 App. D. C. 563; *State* v. *Smith,* 13 Kan.
274; *State* v. *Cannan,* 126 Iowa, 291; *Starr* v. *United States,*
153 U. S. 614; *State* v. *Moyer,* 58 W. Va. 146; *State* v. *Mc-
Donald,* 133 N. C. 680; *Standard Oil Co.* v. *Brown,* 218 U. S.
78; *Snell* v. *State,* 50 Ga. 219; *Snell* v. *State,* 50 Ga. 212;
*State* v. *Rully,* 4 Mo. App. 392; *State* v. *Bradley,* 32 La. Ann.
402; *State* v. *Burgess,* 74 N. C. 272; *State* v. *Flint,* 52 La.
Ann. 62; *State* v. *Irwin,* 71 Pa. (Col.) 608; *State* v. *Jackson,*
30 Me. 29; *State* v. *Lapage,* 57 N. H. 245; *State* v. *London,*
3 S. C. 230; *State* v. *McCoy,* 14 N. H. 364; *State* v. *McNay,*
100 Md. 622; *State* v. *O'Kean,* 35 La. Ann. 901; *State* v.
*Owens,* 10 Rich. L. 169; *State* v. *Rowe,* 142 Mo. 439; *State*
v. *Silva,* 130 Mo. 440, 463; *State* v. *Smith,* 47 La. Ann. 432;
*State* v. *Smith,* 13 Kan. 274; *State* v. *Vance,* 31 La. Ann. 398;
*State* v. *Taylor,* 43 La. Ann. 1131; *State* v. *Williams,* 30 La.
Ann. 1028; *St. L. & S. F. R. Co.* v. *Seale,* 229 U. S. 156, 162;
*Thomas* v. *United States,* 156 Fed. 898, 913; *Thorwegan* v.
*King,* 111 U. S. 514; *Tobin* v. *People,* 104 Ill. 565; *Tucker* v.
*Hemmicker,* 41 N. H. 317; *Tucker* v. *O'Brien,* 117 N. Y.
1010; *United States* v. *Bank of Met.* 15 Pet. 377; *United
States* v. *Gale,* 109 U. S. 169; *United States* v. *Green,* 136 Fed.
630; *United States* v. *Green,* 136 Fed. 628; *United States*
v. *Green,* 199 U. S. 601; *United States* v. *Vorhees,* 9 Fed.
143; *Wadley* v. *Com.* 98 Va. 813; *Wickerman* v. *DuBois,* 34
App. D. C. 146; *Williams* v. *State,* 158 Me. 58; *Williams* v.
*United States,* 168 U. S. 382; *Abert's Comp. Stat.* Sec. 75, chap.

19, Sec. 76, chap. 50; D. C. Code, Secs. 1, 174, 198, 185–189, 178–185, 204–206, 209–214, 199–201, 834; 7 Enc. Pl. & Pr., p. 456; 2 Kilty, Laws of Md. chap. 87; U. S. Rev. Stat. 2d ed. 1878, p. 47; Rev. Stat. Sec. 5451, U. S. Comp. Stat. 1901, p. 3680; 10 Am. & Eng. Enc. Law, 2d ed. Sec. 1032; 12 Am. & Eng. Enc. Law, Sec. 863; Clarks' Crim. Law, 2d ed. Sec. 20, p. 56; 15 Cyc. 526, 517, 514, 535; Greenl. Ev. Sec. 34; Wharton, Am. Crim. Law, Sec. 1833.

*Mr. John E. Laskey,* United States District Attorney, and *Mr. James B. Archer* and *Mr. Bolitha J. Laws,* Assistants, for the United States, in their brief cited:

*Clark* v. *United States,* 19 App. D. C. 295; 16 Cyc. 94; *De Leon* v. *Territory,* 9 Ariz. 161; *Fields* v. *United States,* 27 App. D. C. 433; *Herman* v. *State,* 131 Ill. 594; *Howgate* v. *United States,* 7 App. D. C. 217; Hughes, Instructions, par. 735; *Hyde* v. *United States,* 35 App. D. C. 475; *Jameson* v. *People,* 145 Ill. 735; *Linnehan* v. *State,* 116 Ala. 471; *Louisiana* v. *Starr,* 52 La. Ann. 610; *Norman* v. *United States,* 20 App. D. C. 494; *Owens* v. *State,* 120 Ga. 209; *People* v. *Ah Len,* 27 Am. St. Rep. 103; *People* v. *Doody,* 172 N. Y. 165; *Posey* v. *United States,* 26 App. D. C. 302; *Price* v. *United States,* 14 App. D. C. 391; *Reagan* v. *United States,* 157 U. S. 301; *Simms* v. *State,* 146 Ala. 109; *State* v. *Carroll,* 21 L.R.A.(N.S.) 311; *State* v. *Moyer,* 58 W. Va. 146; *Travers* v. *United States,* 6 App. D. C. 450; Underhill, Crim. Ev. par. 290; *United States* v. *Green,* 136 Fed. 630; *United States* v. *Wood,* 14 Pet. 428; *Wood* v. *United States,* 16 Pet. 341; *Wright* v. *United States,* 158 U. S. 232; Abert's Comp. Stat. sec. 75; Act Gen. Assembly of Md. January 20, 1798; D. C. Code, sec. 198; Revised Statutes: Secs. 782, 794, 1757; 23 Stat. at L. chap. 46.

Mr. Justice ROBB delivered the opinion of the Court:

To avoid needless repetition, we will state the various assignments of error as we reach them, and will first consider the assignment relating to the failure of the members of the jury

commission to take an oath as such. Sec. 198 of the Code [31 Stat. at L. 1222, chap. 854] constitutes the clerk of the supreme court of the District, the United States marshal, and the collector of taxes for the District, "a commission to from time to time make the list of jurors for service in said court," etc. Nowhere in the Code is there a provision requiring these commissioners to take oath as such, but under sec. 174 the clerk of the supreme court is required to take the oath prescribed by law for the clerks of the district courts of the United States, and by sec. 186 provision is made for the taking by the marshal of the oath required by the general statutes of marshals of the United States. Under the order of the commissioners of the District, made in pursuance of law, the collector of taxes is required to take oath for the faithful performance of his duties of his office. Each of these officers took the oath required of him. By sec. 198 their duties were enlarged to the extent specified. That section created no new office, but merely required the three officers named, who already were in office and under oath, to perform this additional duty. Clearly, therefore, the taking of an additional oath would serve no useful purpose. The service required of these officers under sec. 198 is as much a part of their duty as any other service rendered by them. We find no merit in this assignment. See *State* v. *Starr,* 52 La. Ann. 610, 26 So. 998.

At the close of the government's case defendant moved that it be required to elect upon which of the two counts of the indictment a conviction would be claimed, which motion the court denied, saying: "You cannot require them to stand on one of several varying methods of charging the same offense." In his charge the learned trial justice directed attention to the fact that the first count charged that the property converted was money belonging to Frederick M. Smith, and that the third count charged that the property converted belonged to Smith and the other persons named, and stated what was fully understood and conceded, namely, that "the offense with which the defendant Fulton is charged represents one transaction." The jury returned a verdict of guilty under both counts, whereupon

defendant moved in arrest of judgment upon the ground, among others, that the verdict was so inconsistent and contradictory that no valid judgment could be entered thereon. The denial of this motion, as well as the denial of that made at the close of the government's case, is assigned as error. The first may be disposed of summarily, since, as the trial justice suggested, the prosecution is seldom if ever required to elect upon which of several counts charging the same offense, but in various ways, it will stand. *Herman* v. *People,* 131 Ill. 594, 9 L.R.A. 182, 22 N. E. 471. It might well be that to insist upon such an election would result in a failure of justice, owing to the fact that the jury might take a different view of the evidence than the prosecuting officer.

The second contention presents greater difficulties. If this money belonged to Smith individually, it could not have belonged to him and the other persons named. And yet the jury has found that it could and did. The court properly told the jury that the offense charged represented a single transaction, but the verdict of the jury convicts defendant of two. The government contends, first, that because a portion of the sum named in the indictment belonged to Smith and the remainder to the other persons named, defendant was rightfully convicted under both counts. There were seventeen persons, including Smith, in whom ownership was alleged. Therefore, under the government's contention, defendant might have been convicted under seventeen counts, instead of two. This contention cannot be upheld. The indictment charged the embezzlement of a lump sum, and the proposition is too plain to admit of argument that if the jury had found that this sum belonged to Smith, such a finding negatived the possibility of ownership in anyone else. On the other hand, a finding that it belonged to Smith and the other persons named in the third count of the indictment negatived the averment in the first count that it belonged to Smith alone.

The government's next contention is that, inasmuch as the sentence imposed was within the punishment prescribed for the crime charged in either of the two counts, the judgment should

be upheld.  This contention, too, must fail.  While it is the rule
in the Federal courts that in a criminal case a general judgment
upon an indictment containing several counts and a verdict of
guilty on each count will not be reversed on appeal if any count
is good (*Claassen* v. *United States,* 142 U. S. 140, 35 L. ed.
966, 12 Sup. Ct. Rep. 169; *Evans* v. *United States,* 153 U. S.
584, 38 L. ed. 830, 14 Sup. Ct. Rep. 934, 9 Am. Crim. Rep.
668), this rule obviously does not apply in a case where the
verdict was upon counts charging distinct and inconsistent
offenses.  *Davis* v. *United States,* 37 App. D. C. 126; *Com.* v.
*Haskins,* 128 Mass. 60.  In the *Davis Case* there were counts
in the indictment which charged the defendant with having
obtained money by false pretenses, and other counts charging
embezzlement of the same money, and the verdict was guilty as
to both.  After pointing out the inconsistency of the verdict, we
said:  "It is not the province of the court to conjecture which
theory the jury would have adopted had their attention been
drawn to the matter.  That is a question for their determina-
tion."  So here, it is no answer to say that because the jury
probably would have returned a verdict under one of the two
counts, defendant was not harmed.  He was entitled to a deter-
mination of this question of fact by the jury.  Moreover, while
the sentence imposed does not exceed the maximum penalty
possible under a conviction upon either count, it is mere con-
jecture to say that the court was not influenced by the double
conviction.  We conclude that the court committed error in per-
mitting the jury to return a verdict of guilty upon both counts.

During his argument to the jury Mr. Laws, an assistant dis-
trict attorney, said:  "Here is presented in this court room
what purports to be a carbon copy of a letter written to Mr.
Frederick M. Smith, Donnelly, Minnesota, dated November 4,
1913.  *  *  *  We objected to this when it first came out
because we *believed* and we *knew* that it was a statement gotten
up by this defendant."  Thereupon the following colloquy took
place between respective counsel and the Court:

Mr. David:  I object to that statement.

Mr. Lambert: Counsel is undertaking to testify in this case.

Mr. Laws: I submit I have a right to argue that.

Mr. Lambert: You have not any right to state what you say you know as a fact.

The Court: No, not what you *know;* but you have a right to say what you think the reasonable inference is.

Mr. David: I ask that the jury be instructed to disregard what counsel has said.

Mr. Laws: They understood what I meant.

Mr. David: I ask for a ruling on that.

The Court: The court will say to the jury that counsel's belief is something that the jury have nothing to do with.

Mr. Lambert: It went further than that. He said "We know this," and "We know that."

The Court: Of course counsel cannot be very critical of the actual use of mere words in the English language. What the court says to the jury is—whether it is a *belief* or *knowledge* on the part of counsel—that here is a situation from which you as reasonable men will infer such a situation. That is all that the jury can consider in connection with counsel's statement.

Thereupon Mr. Laws said: "Of course I was not in the office, and did not see him write that out a few days ago——." At this point counsel for defendant interposed an objection, and moved that a juror be withdrawn. In overruling the motion the court said: "Of course, the jury are to consider that in all this argument, all counsel is doing is arguing the reasonableness of the proposition he advances, and that it is not based upon any knowledge he has, because he cannot have any."

In our view, the above language was highly objectionable and prejudicial, and the action of the court fell short of the requirements of the situation. The letter to which counsel for the government referred, and which he stated to the jury he not only "believed" but "knew" had been recently gotten up by defendant for the purposes of the trial, had been introduced in evidence by the government itself. Upon what theory a party may introduce evidence generally, and then impeach it, has not been ex-

plained, and does not suggest itself to the court. But the vice of these remarks goes deeper than that. The district attorney and his assistants are sworn officers of the law, and charged with grave responsibilities. It is natural and proper that they should be regarded with respect and confidence by the public in general. It is still more natural that jurors in criminal cases should regard them in much the same light that the court is regarded, and that their attitude should exert a more or less potent influence in the determination of the grave issues presented. Knowing his responsibility, and knowing that the defendant was entitled to have the issue determined upon the evidence and that alone, the assistant district attorney stepped aside from the office of counsel for the government, and became a witness for it. The language used admits of no other interpretation, and must have been so understood by the jury. Had the court promptly rebuked counsel, and counsel had disclaimed any personal knowledge of the facts, perhaps the error then was capable of correction; but that was not done. On the contrary, there was no withdrawal of the language, but rather a repetition of it. Even some of the language employed by the court accentuated it, for the court said: "What the court says to the jury is, whether it is a belief or knowledge on the part of counsel,—that here is a situation from which you as reasonable men will infer such a situation." We cannot escape the conclusion that at the close of the colloquy between the court and respective counsel, the impression had been left with the jury that the assistant district attorney personally knew that this letter, one of the most important items of evidence in the case, had been fraudulently prepared by the defendant for the purpose of the trial. And even if a doubt existed, it would be our duty to give the benefit of it to the defendant.

As another trial of this case is probable, it is proper for us to state that in our view the court committed error in failing to admit in evidence the copy of the above letter of November 4th, 1913, when it was offered by defendant. Its materiality is of course conceded. Smith testified that "he had not received a letter of that kind;" that he would not be certain he had pre-

served and turned over to the district attorney all the letters he had received from defendant; that he "had brought all the correspondence he could find." The first step in laying the foundation of this copy was therefore taken. The second and remaining step was fully taken, we think, by the testimony of defendant and Mr. Bennett. Mr. Bennett was an entirely disinterested witness, and his testimony is consistent and his credibility unassailed. To rule that this testimony did not prima facie make a case of the mailing of this letter would amount to a denial, in almost every case, of the right to introduce a copy. Had Mr. Bennett testified that he remembered distinctly actually dropping this particular letter in the mail chute, it is not likely that anyone would have believed him. He did testify that he remembered writing it, and that there was no deviation from the usual custom under which all letters were taken to defendant for his signature immediately upon their being written out, after which the witness "immediately stamped, put them in envelopes, and sent them off."

The introduction of this letter by the government later, during defendant's cross-examination, did not cure the above error. Defendant was entitled to have this vital piece of evidence go to the jury as a part of his defense. The question as to its authenticity was for the determination of the jury, but it was excluded by the court upon the theory that not even a prima facie case of mailing it had been made out. And when we come to consider the subsequent attitude of the government concerning it, the error is still more apparent, for after encompassing its exclusion as evidence for the defendant, the government introduced it to contradict and prejudice him. Thus his shield was seized, beaten into a sword, and turned against him.

The defendant requested the court to instruct the jury that if they should find that he appropriated the money mentioned in the indictment to his own use, in the belief that Smith had consented or assented to his using the same, and that he did not at that time intend wrongfully or fraudulently to convert it, then such appropriation was not embezzlement as charged, and no subsequent act of his would change the character of the

original appropriation. This request was denied, but the court
in the charge told the jury that "the wrongful or fraudulent
conversion and appropriation of money as property to one's
own use is more than the mere conversion and appropria-
tion;" that the law contemplated that such conversion and
appropriation must be accompanied with an evil intent.
Later on in the charge the court said: "It is then for
you to determine whether there was a wrongful or fraudulent
conversion, and that brings you to what is fundamentally the
defense in this case; * * * and the defense is that there
was not a fraudulent conversion of that money, because when
this money was received, on the 10th and the 13th of November
as to the two separate checks, *that there had been, some months
prior thereto,* an arrangement between the witness Frederick M.
Smith and the defendant Fulton by which the defendant could
borrow that money between the time it was collected and the
time he would repay it to him." After pointing out that if
such a "contract or understanding or agreement of any sort"
should be found to have existed, subsequent failure on the part
of the defendant promptly to remit would not amount to embez-
zlement, the court said: "Upon the other hand, it is for you,
upon all the circumstances of the case, to determine whether
or not at the time the defendant Fulton received, in November,
this money as the attorney and agent of Frederick M. Smith
and the others, there is left in your mind a reasonable doubt as
to whether or not there was such an agreement. It is for you,
as the judges of the facts in this case, so to determine, and if
you find that there was not, from all of the circumstances, facts,
and evidence, including the letters and the testimony of all the
witnesses, both for the government and the defendant, and that
that money was received by the defendant, Fulton, *without such
an agreement actually having been made,* and the cash and the
money then converted to his own use, and thereafter used, then
you have the right upon those facts to find that it was a fraudu-
lent conversion, and if you shall so find it would be your duty
to render a verdict of guilty as indicted."

In *Masters* v. *United States,* 42 App. D. C. 350, Ann. Cas.

1916A, 1243, in an opinion by Mr. Justice Van Orsdel involving an interpretation of the very statute upon which the counts of this indictment were based, we said: "Before there can be a conversion of the property of another, there must be an intent on the part of the doer of the act to convert the property to his own use without the consent of the owner. *State* v. *Silva,* 130 Mo. 440, 463, 32 S. W. 1007. But a wrongful conversion implies a conversion by the doer of the act without color of right, and with the evil intent of converting the property to his own use. The intent to wrongfully convert the property of another implies more than the intent to merely convert. It implies a mind at fault, an evil mind, capable of intentionally committing the offense here defined by the statute." In *Wadley* v. *Com.* 98 Va. 810, 35 S. E. 452, which was a trial under an indictment for embezzlement, the court was asked to instruct the jury that before they could convict the defendant they must find that the conversion was accompanied by a criminal intent, "and not under an honest belief that he (defendant) had a bona fide claim of right to do so." The instruction was modified by the striking out of the words quoted. This the court characterized as error, saying: "In embezzlement there must be a fraudulent purpose to deprive the owner of his property, and appropriate the same. If property is converted under a bona fide claim of right, the conversion is not embezzlement. If, therefore, upon another trial there should be evidence tending to show that the prisoner acted under an honest belief that he had a bona fide claim of right, instruction No. 3, as asked for, must be given."

Under the instruction as given by the learned trial justice in the present case, the letter from the defendant to Smith on November 4, 1913, was practically withdrawn from the consideration of the jury, even though they should find that it actually was written and sent as testified to by the defendant and the witness Bennett, for the court specifically limited the jury to a determination of the question whether, some months prior to the recovery of this money by defendant, an arrangement had been entered into between the defendant and Smith, whereby the defendant became entitled to use the money. Not only this,

but the final words of the court were that if the jury should find that the defendant, *"without such an agreement actually having been made,"* used this money, it was the duty of the jury to return a verdict of guilty. That is to say, the jury in effect were told that before they could consider the letter of November 4th they must find not only that it was mailed, but that it actually was received by Smith. Here was error, for if the letter was mailed, and the defendant thereafter acted under the honest belief that it had been received, there was lacking the essential element of the crime charged, or evil intent, and the verdict should have been "Not Guilty." The evidence before the jury warranted a substantial compliance with the prayers offered.

The next assignment of error relates to the refusal of the court to instruct the jury that if they believed, from the evidence in the case, that there was a conflict or inconsistency in the testimony of any witness or witnesses upon any material fact, and that, by reason of such conflict or inconsistency, they were not satisfied beyond reasonble doubt as to what the fact or truth of the matter was, they should give the benefit of such doubt to the defendant, and to the action of the court in cautioning the jury as to the testimony of the defendant. In his charge the learned trial justice, after telling the jury that if they should find that the defendant used the money without an agreement actually having been made with Smith they might find a fraudulent conversion, said that they should look to any interest the respective witnesses had in the trial or in its results. The court then said: "Where a witness has a direct personal interest in the result of the trial, the temptation is strong to color, pervert, or withhold the facts; the law permits the defendant, at his own request, to testify in his own behalf. The defendant, Fulton, has availed himself of the privilege. His testimony is before you, and is to be considered along with the other evidence in the case. The deep personal interest which he may have in the result of the case should be considered by you in weighing his evidence, and in determining how far or to what extent it is worthy of credit." No other witness was mentioned in this connection.

In *Hicks* v. *United States,* 150 U. S. 442, 452, 37 L. ed. 1137, 1141, 14 Sup. Ct. Rep. 144, the court said: "It is not unusual to warn juries that they should be careful in giving effect to the testimony of accomplices; and perhaps a judge cannot be considered as going out of his province in giving a similar caution as to the testimony of the accused person. Still, it must be remembered that men may testify truthfully although their lives hang in the balance, and that the law, in its wisdom, has provided that the accused shall have the right to testify in his own behalf. Such a privilege would be a vain one if the judge, to whose lightest word the jury, properly enough, give a great weight, should intimate that the dreadful condition in which the accused finds himself should deprive his testimony of probability. The wise and humane provision of the law is that 'the person charged shall, at his own request, but not otherwise, be a competent witness.'" While in *Reagan* v. *United States,* 157 U. S. 301, 305, 39 L. ed. 709, 710, 15 Sup. Ct. Rep. 610, it was again ruled that it was not error for the trial court to direct the attention of the jury to the interest which any witness, including of course the defendant, may have in the result of the trial, as a circumstance to be considered in determining the credence which should be given to his story, the court was careful to point out that the limits of suggestion are the same in respect to the defendant as to the other witnesses.

In the present case the determination of the question of the guilt or innocence of the defendant depended almost entirely upon whether the jury believed the defendant and his witness Bennett, or the complaining witness, Smith. It is said that the testimony of the defendant was inconsistent with his conduct, but no one can read this record without reaching the conclusion that the testimony of the witness Smith on its face is contradictory and unsatisfactory. If the statement contained in the letter of December 11, 1914, which he testified he wrote the defendant after consulting with his attorney in Minnesota, is to be accepted as true, he was himself apprehensive of trouble because of conduct which he apparently realized was full of inconsistencies. And yet the jury in effect were given to under-

stand that the defendant was the only witness who had a deep personal interest in the result of the trial. Grant that his interest was greater than that of any other witness, he should not have been singled out as the only witness whose testimony deserved close scrutiny. If something more than a general caution was demanded, the attention of the jury should also have been drawn to the interest of the witness Smith.

We think the promissory note which the defendant gave Smith on December 7, 1914, should have been received in evidence, as bearing upon the question whether the relation between Smith and the defendant at the time was that of debtor and creditor, as claimed by defendant, or attorney and client, as claimed by Smith.

Some fault is found with the court's charge concerning the burden of proof and the presumption of innocence. It is enough to say that there was a substantial compliance with the rule laid down in *Agnew* v. *United States,* 165 U. S. 36, 51, 41 L. ed. 624, 629, 17 Sup. Ct. Rep. 235, and in *Holt* v. *United States,* 218 U. S. 245, 253, 254, 54 L. ed. 1021, 1030, 1031, 31 Sup. Ct. Rep. 20, 20 Ann. Cas. 1138.

There are other assignments of error, but we have found them so devoid of merit as not to justify discussion.

The judgment must be reversed and the cause remanded for a new trial.                    *Reversed and remanded.*