STATE of Missouri, Respondent,

v.

Frank PIGQUES, Appellant.

No. 46262.

Supreme Court of Missouri,
Division No. 1.

March 10, 1958.

James A. Bell, St. Louis, for appellant.

John M. Dalton, Atty. Gen., J. Richard Roberts, Sp. Asst. Atty. Gen., for respondent.

VAN OSDOL, Commissioner.

Defendant, Frank Pigques, was charged with and found guilty of the offense of attemped burglary in the second degree, Sections 560.070 and 556.150, RSMo 1949, V.A.M.S., and his punishment assessed by the jury at two years' imprisonment in the penitentiary. He has appealed from the ensuing judgment.

The defendant was employed by Louis Kunin and Allen Keyser who operated a

business at 1550 South Second Street, St. Louis, Missouri, under the name of United Poultry. The testimony indicated that on September 22, 1956, the defendant concluded his work at about 1 p. m. and went across the street to a tavern. At 3:30 p. m., Mr. Kunin locked the building and he and his bookkeeper left the premises. After they had entered Mr. Kunin's car they observed the defendant going across the street to the United Poultry building. He went to the rear of the building and Kunin drove to a point in the opposite alley where he could watch defendant. He testified that defendant had some sort of instrument in his hands and was trying to pry the garage door open. At this point defendant apparently became frightened and dashed across the alley into a lot where lumber and pipe were stored. Mr. Kunin then left the scene and went in search of a policeman. Within a few minutes he found a police car and both cars immediately proceeded to the rear of the poultry building.

The doors where defendant had been seen led into a portion of the building which is referred to as the garage. At that place there were two sliding doors which appeared to be no longer used for ingress and egress as two 2x4's had been nailed across the inside of the doors for "permanent security." Recessed about one foot behind these wooden doors was another door which was made of heavy-gauge wire mesh screening. This screen door was locked and 2x4's had also been nailed across it. When Mr. Kunin and the police arrived at the building they found that the wooden doors had been pried open and the defendant was in the area between the wooden doors and the screen door herein described. When questioned as to his reason for being there, defendant stated that he had gone behind the doors to urinate. An examination of the area, however, did not indicate that he had done so. There was no evidence of any attempt to get through the inner door.

Mr. Kunin and one of the officers examined the interior of the building and found two crates of dressed chickens hidden behind a door in the garage. Those chickens were ordinarily kept in the cooler. At that time defendant denied that he had placed the chickens there, but, nevertheless, offered to pay Kunin for them. When questioned the next day, defendant told the police that "he had hid the chickens with the intention of coming back later and breaking in and getting them." The defendant did not testify at the trial.

The defendant's first contention is that the evidence is unsufficient to support a conviction of attempted burglary because all of the evidence was to the effect that defendant was inside the wooden doors and hence he had entered the building and was therefore guilty of burglary, if anything. It is provided in Section 556.160, RSMo 1949, V.A.M.S., that "No person shall be convicted of an * * * attempt to commit any offense, when it shall appear that the crime intended or the offense attempted was perpetrated by such person * * * in pursuance of such attempt."

It may not be said that defendant was shown to have committed a burglary, unless the evidence indicated that he was guilty of breaking and entering the building with intent to steal goods and merchandise kept therein. Section 560.070, supra. There was substantial evidence tending to show that defendant broke open the outer wooden doors heretofore described and that he did so with intent to steal chickens deposited in the building. All of the evidence was to the effect that defendant had entered into the space between the outer wooden doors and the inner wire-mesh door. The question presented, therefore, is whether his entry into that space would constitute an entry into the building within the meaning of Section 560.070, supra. If that question is answered in the affirmative, then, under all of the evidence, we must conclude that defendant was shown to have perpetrated the completed offense of burglary, and, in that event, under the provisions of the foregoing statute, he could not

have been properly convicted of an attempt. That is to say, if in this case the only evidence of an attempt to commit burglary is that which shows the crime of burglary was fully perpetrated, the case falls within the provisions of Section 556.160, supra, and the trial court's submission of the issue of defendant's guilt of the crime of attempted burglary was erroneous. State v. Scott, 172 Mo. 536, 72 S.W. 897.

(It would appear to be the customary practice of prosecuting officials, in cases where there may be doubt as to whether a defendant has committed the offense or merely an attempt, to charge the offense, and then upon a trial, the issue of defendant's guilt as to either the offense charged or an attempt [and perhaps in some instances both] may be submitted to the jury in accordance with the facts disclosed by the evidence. State v. Scott, supra; State v. Carr, 146 Mo. 1, 47 S.W. 790; Section 556.220, RSMo 1949, V.A.M.S.)

As stated, the evidence shows and it is undisputed that defendant had entered the space between the line which had been delineated by the outer wooden doors before they were breached and the inner wire-mesh door. Now, the evidence was that the inner door was such as would require force to break and pass through it. It was locked and 2x4's had been nailed across it. A witness for the State said that in order to get inside the building defendant "would have to break through the wire mesh. * * * Maybe if you jumped against the mesh hard enough he could have probably gone through it." Therefore, the evidence shows the inner wire-mesh door, until breached, was an additional barrier securing the building from entry by one intending to steal. As we have said, there was no evidence of any attempt to get through the inner wire-mesh door.

Entry is an essential element of the crime of burglary as understood at common law and as defined by our statute, Section 560.070, supra. Literally, "entry" is the act of going into the place after a breach has been effected, but the word has a broader significance in the law of burglary, for it is not confined to the intrusion of the whole body, but may consist of the insertion of any part for the purpose of committing a felony. 9 Am.Jur., Burglary, § 16, p. 249. An entry of a building, that is, an entry (with intent to steal) of the space within the building, is necessary to a completed crime of burglary; but any entry, however slight (by any part of the body), procured by breaking, with intent to steal (or to commit another crime therein, as the charge may be) is sufficient. Vol. 2, Anderson, Wharton's Criminal Law and Procedure (1957), § 421, pp. 42–43. (But we bear in mind that the consummation of the intent to steal is not necessary to complete the crime of burglary. State v. Shipman, 354 Mo. 265, 189 S.W.2d 273; State v. Farris, Mo.Sup., 243 S.W.2d 983.)

Returning to our case—we have the opinion that when defendant had breached the outer wooden doors and entered the area immediately without the inner wire-mesh door, he had only partially progressed in the execution of his burglarious intent to a point where he could have continued in breaching a way through the wire-mesh door—then to enter the building in his intent to steal. But when he had reached this point in making a breach he became alarmed and ran away.

We believe the evidence does not show the crime of burglary was fully perpetrated; but, obviously, there were shown overt acts in the effort to break and enter the building (with intent to steal) which justified the submission and supported the conviction of defendant of an attempt to commit burglary. Section 556.150, supra.

It was argued that the space between the outer wooden doors and the inner door at the aperture of the doorway of the building in the case at bar is analogous to the spaces within chimneys and attics of buildings. We could not follow that argument.

Surely, it has been held that where one enters a chimney with intent to steal there

is sufficient breaking and entering to constitute burglary, although there was no entry of a room below. Olds v. State, 97 Ala. 81, 12 So. 409. We think the chimney cases are in line with the rule with respect to the essentiality of an "entry" of a building, that is, an entry of the space within the building, because a chimney is a part of the building, and when one enters a chimney he is in the building. In Rex v. Brice, Russ. & Ry. 450, 168 Eng.Rep. 892, ten of the twelve judges were of the opinion that a "chimney was part of the dwelling-house; that the getting in at the top was a breaking of the dwelling-house; and that the prisoner, by lowering himself in the chimney made an entry into the dwelling-house." What makes chimney cases exceptional is that no obstruction bars or secures against an entrance through the vent of a chimney. Nevertheless, as stated, it is held that if a thief goes down a chimney to steal, there is a "breaking" and entering. The rationale is—a chimney is a necessary opening and needs protection. It is a part of the dwelling house, and "is as much shut as the nature of the thing will admit." State v. Willis, 52 N.C. 190; Vol. 2, Wharton's Criminal Law, 12th Ed., §§ 982 and 991, pp. 1283 and 1287; and see Donohoo v. State, 36 Ala. 281, and Walker v. State, 52 Ala. 376, cited in the Olds case.

In the case of State v. Whitaker, Mo. Sup., 275 S.W.2d 316, 319, cited by defendant-appellant, defendant Whitaker had broken out panes of glass and part of the upper sash of an attic window of a building and had entered the space which may be called the interior of the attic of the building, and in which attic room or space no goods were kept. Valuable goods and merchandise were in the room below. There was evidence that a part or most of Whitaker's body was through the window "and in the building." It is important to notice that when Whitaker entered through the broken window, no other protecting obstruction, such as the wire-mesh door in our case, further secured the aperture of the attic window of the building against

entry through it into the building. In the Whitaker case there was a "breaking" and an "entering" of the building within the meaning of Section 560.070, supra, and the crime of burglary was complete, although Whitaker had not gone down through the hatchway to the room below where the goods were kept. When a part of Whitaker's body entered the space called the attic, by means of his breach through the broken window, he had entered the building, that is, he had entered the building by way of his breach of the attic window.

In reaching our decision of this branch of the instant case, we had examined the early case of State v. McCall, 4 Ala. 643, 39 Am.Dec. 314. Since the facts of the McCall case are somewhat like those of the instant case, and since we consider the opinion of the reviewing court in the McCall case a classic exposition of what we have endeavored to state as supporting our ruling, we, at the risk of unduly prolonging this opinion, wish to here examine and copiously quote from the reviewing court's opinion.

Defendant McCall had forced the shutters outside a glass window of a dwelling house and protruded his hand between them, but the window remained fastened and unbroken. The trial judge had charged the jury "'that if they believed from the testimony, that the defendant, by the application of force, wrested open the window shutters, and his hands protruded beyond the line made by the shutters when shut, that that in law, was an entry, notwithstanding the sash remained down and the glass was unbroken.'" The charge was held erroneous and the judgment of conviction of burglary was reversed.

In the McCall opinion, certain English cases which seemed to support the trial judge's charge were examined, and the reviewing Supreme Court of Alabama continued as follows,

"The citations from the crown cases, it must be admitted, lend their support to the charge of the Circuit Judge to

the jury. The only difference being, that there was a breach and entry of the sash, while here, the breach and entry was of the blinds, which were the outer protection. This, it is conceived, cannot require the application of a different principle. It cannot be, that the common security of the dwelling house is violated by breaking one of the shutters of a door or window which has several. True, it weakens the security which the mansion is supposed to afford, and renders the breach more easy; but as additional force will be necessary before an entry can be effected, there can, under such circumstances, be no burglary committed.

"Suppose the shutter of a door made by placing plank upon each other until it is two or three double, if the thickness of one of the plank be removed by one intending to commit a burglary, and an entry thus far made, can it be said that the offence was completed? What, in point of principle, is the difference between such a case, and one where there are several shutters, an inch or two apart from each other. In neither case can such an entry be made as will enable the aggressor to commit a felony. In such cases the entry may be said to be made with the intent rather to *procure admission into the dwelling house,* than to *commit a felony,* which we have seen is an indispensable constituent of the crime of burglary.

"To constitute burglary, an entry must be made into the house with the hand, foot, or an instrument with which it is intended to commit a felony. In the present case there was nothing but a breach of the blinds, and no entry beyond the sash window. The threshold of the window had not been passed, so as to have enabled the defendant to consummate a felonious intention; and according to the principle we have laid down, the charge to the jury was erroneous."

Defendant-appellant makes the further contention that the trial court erred in refusing to allow defendant's counsel to cross-examine the prosecuting witness Kunin in an effort to show the bias of the witness, and, in the same connection, in refusing to allow defendant's counsel to show that Kunin was indebted to defendant for wages, and that there had been heated arguments between Kunin and defendant and there was pending or prospective litigation with respect to wages. This evidence, says defendant-appellant, was relevant in bearing upon Kunin's interest and animus in the prosecution and as a witness. It is said the bias or prejudice and interest of a witness is never irrelevant, and always may be shown as affecting the witness' credibility.

■■■ The fact that a witness is interested in the result of an action, civil or criminal, in the trial of which he testifies, or is biased or prejudiced in favor of or against any of the parties thereto is proper to be shown and considered as bearing on the credit which should be accorded his testimony. The interest or bias of a witness and his relation to or feeling toward a party are never irrelevant matters, and where the interest or bias is denied by the witness, it may be shown by the testimony of others, and even where such interest or bias is admitted by the witness, the extent of it may be shown, although much is left to the discretion of the trial court as to how far the inquiry may go into the details of the difficulty, disagreement, or other transaction which caused the hostility, prejudice, or ill feeling. Houfburg v. Kansas City Stock Yards Co. of Maine, Mo.Sup., 283 S.W.2d 539; State v. McLachlan, Mo.Sup., 283 S.W.2d 487; Barraclough v. Union Pac. R. Co., 331 Mo. 157, 52 S.W.2d 998; State v. Decker, 161 Mo.App. 396, 143 S.W. 544; Vol. III, Wigmore on Evidence, 3d Ed., §§ 948–951, pp. 498–509; 98 C.J.S. Witnesses § 556, p. 495.

In examining the transcript on appeal, we have come to the conclusion that the trial judge misconceived the purpose of the

cross-examination of the prosecuting witness Kunin and the purpose of counsel's direct examination of certain of defendant's witnesses; and that, in part because of such misconception, the trial court unduly limited the scope of these inquiries. In demonstrating the bases for our opinion, it is necessary, we believe, to quote verbatim many of the questions, objections and rulings thereon, and the colloquies of the trial judge and counsel during the interrogation of these witnesses.

"Q. (By Mr. Bell, one of counsel for defendant, who was cross-examining the prosecuting witness Kunin) * * *. Now, did you have any particular reason to want to have this man locked up?

"Mr. Crawford: I object to that, Your Honor.

"The Court: Sustained.

"Q. (By Mr. Bell) I see. Did you ever have an argument with the man concerning money?

"Mr. Crawford: I object to that as being irrelevant and immaterial to the issues in the case.

"The Court: Sustained.

"Mr. Bell: If the Court please,— (Whereupon the following colloquy was had at the bench without the hearing of the jury.)

"Mr. Bell: If the Court please. I'm attempting to show the motive for the arrest.

"The Court: That is no motive as far as the arrest goes, that's no motive to show why the man burst the doors open.

"Mr. Bell: The motive is that the man owed him some money and they had an argument about it.

"The Court: Who owed money?

"Mr. Bell: He owed Pigques money, and there is a suit under file against him. It was pending, to file.

"The Court: Suppose he did owe him money. That's a Civil matter.

"Mr. Knox: (also of counsel for defendant) The day before he was arrested they had several arguments about the back money. He refused to fire the man.

"The Court: We are not going to try that lawsuit in this case. This is a question of Burglary In The Second Degree, and the only thing before the Court here. * * *

"Mr. Bell: I want to show the man had a motive to have the man arrested.

"The Court: This isn't,—that case isn't here before us. The only thing we are trying here is this one of Attempted Burglary in the Second Degree. * * * (Whereupon the trial progressed within the presence and hearing of the jury as follows:)

"Q. (By Mr. Bell) I want to ask you this. How long did Mr. Pigques work for you? A. Approximately two years. * * *

"Q. (By Mr. Bell) Did you ever have any trouble or an argument? A. I didn't, no, sir. * * *"

Again on direct examination of a witness for defendant the interrogation was as follows,

"Q. Can you give me a date about when was the last time you heard a conversation between Mr. Pigques and Mr. Kunin?

"Mr. Crawford: I object to that for the same reason, and it is immaterial to the issues in this case. The witness has testified he was last employed in June of 1956, so any conversation prior to this incident would, in question here,

that is, in September, 1956, wouldn't have any bearing on the issues here.

"The Court: Sustained. * * * (Whereupon, the following colloquy was had at the Judge's bench without the hearing of the jury.)

"Mr. Knox: This witness, Your Honor, has been present on several occasions when Mr. Kunin and Mr. Pigques had violent arguments about back salary.

"Mr. Bell: This man had a particular motive to dispose of Mr. Pigques. These arguments were about money. This witness knows of the motives.

"Mr. Knox: We are offering this for the purposes of impeaching the testimony of Mr. Kunin. He had a personal interest. * * *

"The Court: The Court will permit you [to] ask the question as to whether or not there had been arguments between Mr. Kunin and the defendant, that he overheard, but that is as far as the Court will permit you to go. (Whereupon the trial progressed within the presence and hearing of the jury as follows:)

"Q. (By Mr. Knox) Mr. Stowers, do you know of any argument between the defendant, Mr. Pigques and Mr. Kunin, that you overheard? A. Yes, sir, I sure do. They used * * *

"Q. (By Mr. Knox) What were the arguments about?

"Mr. Crawford: I object to that, too.

"The Court: Sustained."

Again in the direct examination of a witness for defendant, the questions, answers, and rulings of the trial court were as follows,

"Q. What does your job consist of? A. Supervision of the investigators of the St. Louis office.

"Q. St. Louis Office of what? A. Wage and Hour Division. * * *

"Q. * * * To your knowledge, do you know whether there was an investigation of the United Poultry Company? * * * (The objection to that question was sustained.)

"Q. (By Mr. Knox) Mr. Powers, have you ever had an occasion to read any report by the Defendant, Frank Pigques, that he made to one of the investigators?

"Mr. Crawford: I object to that, Your Honor, the best evidence would be the record itself. I think, too, it's out of the scope of this case.

"The Court: Sustained. * * * (Whereupon, the following colloquy was had at the Judge's bench without the hearing of the jury:)

"Mr. Knox: The records of the Federal Court are not in this at the present time.

"The Court: That's a matter that is not involved here. That is another legal action of some kind. If this man has a civil case, he has a civil case, but—

"Mr. Knox: The whole thing is tied together.

"Mr. Bell: Without one we wouldn't have the other.

"The Court: The proceedings in the federal government would not go to the merits of this man's attempted burglary.

"Mr. Bell: It goes to the credibility to the impeachment, to the credibility. He denied the investigation. He denied that. Certainly we have a right to show a motive.

"The Court: This isn't as a result of a matter of that kind. This is Second Degree Burglary, Attempted Second Degree Burglary, and the police caught

that man in the place. I don't see how any of this has anything to do with that. Now, if it were assault, or something like that I could understand it, but here he was apprehended by the police officer on the property, inside the broken door. What has the labor case got to do with this? * * *

"Mr. Bell: He had a motive for prosecuting him.

"The Court: You don't have to have a motive to prosecute—Mr. Kunin would never have had to have been present and the crime would have been committed.

"Mr. Bell: Mr. Kunin stated that he went down and sat in the alley, and that he goes and brings the police back to this particular place.

"The Court: He didn't tell the man to break the door, did he?

"Mr. Knox: It's a personal friction, and if he broke the door,—

"The Court: The question of the facts in this case, that's a question for the Jury in this case. It's the very point of this case. The objection will be sustained. (Thereupon the trial progressed within the presence and hearing of the jury as follows:)

"Mr. Crawford: That's all I have, Your Honor.

"Mr. Knox: That's all."

The witness was excused, and the defendant rested his defense.

■ To begin with, the trial court sustained an objection, with no grounds stated therefor, to the first question we have quoted. This question, although a general one, was designed to bring out any interest the prosecuting witness Kunin had in the prosecution. We see nothing really wrong with this question. It was not improperly within the field of inquiry to ask the prosecuting witness (who had called the arresting officers, and who was testifying for the State) as to the motive he had for his conduct in so doing. Goldman v. State (false pretenses—cross-examination of prosecuting witness relating to causing the arrest to force payment of debt), 128 Neb. 684, 260 N.W. 373; Wadley v. Commonwealth (embezzlement—witness who was active in procuring indictment was asked if his efforts to procure it was in order that he might use it to compel defendant to pay debts—error to exclude it), 98 Va. 803, 35 S.E. 452; Vol. III, Wigmore on Evidence, § 950, supra; 98 C.J.S. Witnesses § 552, pp. 493–494, at page 494—"Evidence as to the motive of a prosecuting witness in reporting accused to the arresting officer may be shown."—citing Wimberley v. State, 94 Tex.Cr.R. 252, 250 S.W. 691.

Then the prosecuting witness was asked if he and defendant ever had an argument "concerning money." Objection to this question was sustained. However, after an extended colloquy, the witness was permitted to answer the question whether the witness and defendant had ever had "any trouble or an argument." This, the witness denied.

■ On direct examination of a witness for defendant, defendant finally was permitted to in part contradict the witness Kunin by testimony that the witness had heard arguments between Kunin and defendant, but the trial court excluded testimony of what the arguments were about. Kunin had denied having had trouble or an argument with defendant; and, moreover, here we have no impeachment by the witness' statements or utterances, and it was unnecessary to lay the foundation for other testimony of witness' conduct tending to show his bias or interest. Barraclough v. Union Pac. R. Co., supra. We think it was competent to show by other witnesses that Kunin and defendant had had trouble and arguments about money or wages, that is, it is not too much to say that the subject of the difficulty and arguments (with reasonable limitation as to details and as to which of the disputants

were in the wrong) would have been a proper disclosure (so the jury could have considered whether the subject of the controversy or arguments was trivial or important), as well as the general nature of the arguments as being casual or protracted, mild or violent, all to the purpose of reasonably enabling the jurors to formulate their views of the degree of animosity engendered. But as we have noticed, the trial court announced it would permit defendant's counsel to ask the witness if there had been arguments between Kunin and defendant, but admonished—"that is as far as the Court will permit you to go."

Continuing our study of the quoted portions of the transcript of the testimony of this and another of defendant's witnesses and of the several colloquies between the trial judge and defendant's counsel, we can readily see defendant was seeking to show there was a controversy or dispute and arguments between the witness Kunin and defendant about wages, and that prior to or at the time of the averred offense a complaint had been or was about to be filed against United Poultry because of the dispute about wages—something in the nature of litigation was contemplated or pending. We note the trial court sustained objections to all questions concerning these facts. We think these facts were relevant and competent in tending to show the interest and animus of this witness, who was the prosecuting witness in this case. And, furthermore, it could hardly be said the trial court was, in fact, acting in the exercise of its discretion in excluding the testimony as to these matters, because it is clear the trial judge thought any evidence of any trouble or difficulty or any civil proceeding about wages was irrelevant and inadmissible for any purpose in this case.

It is true defendant's counsel during the interrogation of defendant's witnesses made no formal offer to prove the controversy, dispute, and proceedings relating to wages. But it is also true from the trial court's rulings and the trial judge's remarks during the colloquies quoted, that any such formal offer of proof would have been useless (see, generally, 88 C.J.S. Trial §§ 74–75, pp. 179–181, at page 180), inasmuch as the whole of this line of testimony had been consistently and austerely excluded. And the trial court, in the several colloquies, surely was advised, as are we, of what it was defendant was seeking to prove. See now Merk v. St. Louis Public Service Co., Mo.Sup., 299 S.W.2d 446, at page 450.

During the cross-examination of Kunin, and during direct examination of witnesses for defendant, defendant's counsel had sometimes stated the purpose of the testimony of arguments, disputes, and proceedings relating to wages was to show Kunin's "motive for the arrest," "motive for prosecuting him," "motive to dispose of Mr. Pigques," and "goes to the credibility to the impeachment * * *." All of these stated purposes of such testimony add up to the same thing—to show the interest and animus of the witness for the consideration of the trier of the fact in determining the credit and weight to be given the witness' testimony.

■■■ We hold the trial court unduly and erroneously circumscribed defendant in his effort to show the interest and animus of the prosecuting witness Kunin, and the judgment of conviction is to be reversed and the cause remanded for that reason.

■■■ It was not erroneous to permit the showing that crated chickens were in the building, and not erroneous to admit testimony of defendant's admissions that he had secreted them there. This evidence tended to show that "goods, wares and merchandise" were kept or deposited in the building, and tended to show defendant's design to break, enter and steal them therefrom.

■■■ Defendant-appellant complains that the State's principal instruction (submitting the issue of defendant's guilt of an attempted burglary) was "misleading, confusing, unintelligible and (submitted) an attempted larceny rather than an attempted

burglary in the second degree." We suppose the complaint goes to the language of the instruction requiring the jury to find an attempt to break and enter the building "with intent * * * to steal." There is no merit to this complaint. See again Section 560.070, supra. Defendant-appellant makes no further attempt to point out wherein the instruction was misleading or confusing so there is nothing further presented for our review. State v. Shipman, supra.

The judgment should be reversed, and the cause remanded.

It is so ordered.

COIL and HOLMAN, CC., dissent from that part of the opinion which holds that State's evidence did not show a completed burglary; concur in remainder of opinion.

PER CURIAM.

The foregoing opinion by VAN OSDOL, C., is adopted as the opinion of the court.

All of the Judges concur.